In re. HUNTER ARMS CO.

RICE v. HUNTER ARMS CO.

(District Court, N. D. New York. October 11, 1915.)

BANKRUPTCY ⊂⇒164—CLAIMS—CORPORATE FUNDS.

Three corporations had interlocking directorates; the directors of the Arms Company and the Paper Company being the same. The Paper Company sold its bonds to raise money to build a plant. These funds were by its treasurer commingled with the funds of the Arms Company. The third corporation was considerably indebted to the Arms Company. Thereafter it was agreed by a majority of the directors of the Arms Company and Paper Company at an informal meeting that the Paper Company should lend practically all of the proceeds of the bond issue to the third company, and that the Arms Company should give it credit on its books. There was no resolution or formal action. It did not appear that the third company acquiesced in the agreement, or that any note or memorandum was executed, although the Arms Company made credit notations on its books. *Held*, in such case, the Arms Company could not escape its liability to creditors of the Paper Company for the funds; the transaction being too indefinite and uncertain to constitute a contract whereby the Arms Company ceased to be a debtor to the Paper Company, the third company taking its place.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 267; Dec. Dig. ⊂⇒164.]

In Bankruptcy. In the matter of the bankruptcy of the Hunter Arms Company. On review of allowance by the referee of the claim of Arvin Rice, as trustee in bankruptcy of the Hunter Bros. Paper Company. Order affirmed.

Edwin J. Mizen, of Oswego, N. Y., for claimant.

Nelson P. Bonney, of Norwich, N. Y. (Jas. P. Hill, of Norwich, N. Y., of counsel), for trustees.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

RAY, District Judge. The claim presented and allowed, after setting forth the making of a trust mortgage by the claimant corporation, states:

"That thereafter, and in or about the year 1906, there was duly issued and sold by said Hunter Bros. Paper Company, under and pursuant to said trust mortgage, to various persons and purchasers, bonds of said company aggregating in amount the sum of $82,000, the proceeds of which said bonds were duly received by said Hunter Bros. Paper Company from the purchasers thereof, and which said bonds were so duly issued and sold, and the proceeds thereof were so received for the purpose of erecting a paper mill upon the aforesaid premises of said Paper Company for the purpose of the manufacture and sale of paper; that in said year one or more of certain officers of said Hunter Bros. Paper Company paid and delivered to said the Hunter Arms Company the moneys and proceeds so received and realized from the issue and sale of said bonds, and said the Hunter Arms Company took and received and had and received of one or more of the officers of the Hunter Bros. Paper Company said moneys and proceeds of said bonds so amounting to the sum of $82,000, which said money and property was so had and received by said the Hunter Arms Company with notice and knowledge that the same were moneys and property of said Hunter Bros. Paper Company, and were not its moneys and property, and said the Hunter Arms Company took, received, and applied said moneys and property to its own uses and purposes; that no paper mill has ever been erected, either by Hunter Bros. Paper Company or by said the Hunter Arms Company, and said moneys and proceeds of said bonds have never been used for that purpose, and said the Hunter Arms Company has had, used, and applied said moneys and property to its own uses and purposes; * * * that since the payment to and receipt by said the Hunter Arms Company of the moneys and proceeds of said bonds so amounting to the sum of $82,000 there has been paid upon the account of the principal thereof the sum of $23,000 and interest to the 15th day of July, 1913, leaving due and owing from said the Hunter Arms Company to this claimant the sum of $59,000, with interest thereon from the 15th day of July, 1913."

Prior to the making of said mortgage and the issue and sale of such bonds to the amount of $82,000 there had been incorporated under the law of the state of New York, and existed, three corporations, the Hunter Arms Company (now bankrupt), the Battle Island Paper Company (now bankrupt), and the Hunter Bros. Paper Company (now bankrupt); the Hunter Arms Company and the Battle Island Paper Company each having its principal place of business and offices at Fulton, Oswego county, N. Y. The Hunter Bros. Paper Company, so far as it had any place of business, and so far as it did any business, had same at Fulton, N. Y., also. The principal business of the Hunter Arms Company was the manufacture and sale of guns or firearms, and the principal business of the Battle Island Paper Company was the manufacture of wood pulp for manufacturing paper. These two last-named corporations had existed some years prior to the incorporation of the Hunter Bros. Paper Company, which was organized and incorporated in 1905, for the ostensible purpose of erecting a paper mill and manufacturing paper; but no mill was constructed and no business was done by it, except to acquire a small parcel of real estate at Fulton, N. Y., of the value of $1,700, and early in 1906 to execute the mortgage referred to and issue and dispose of bonds thereunder to the amount of $82,000. Some stock in this new corporation, Hunter Bros. Paper Company, was also disposed of. For brevity I will refer

to these corporations as the Arms Company, the Battle Island Company, and the Paper Company.

There were six brothers of the name of Hunter, Thomas Hunter, Samuel C. Hunter, James C. Hunter, William Hunter, John Hunter, and Robert B. Hunter. These six brothers were the sole directors of the Hunter Arms Company. They owned the majority of its stock and controlled said corporation. These brothers also owned stock in the Battle Island Company, but not a controlling interest. August 14, 1905, this Hunter Bros. Paper Company was incorporated, with these six brothers as sole directors and subscribers for stock, each agreeing to take and subscribing for 100 shares of its stock, which was to consist of 2,500 shares, of the par value of $100 each, and they continued to be the sole directors of said corporation down to 1913, except William Hunter, and were also the sole directors of the Hunter Arms Company. From 1905 to a short time prior to bankruptcy in 1913, said Thomas Hunter was the president, both of the Arms Company and of the Battle Island Company, and also treasurer of the said claimant, Hunter Bros. Paper Company. The officers of the Hunter Arms Company were Thomas Hunter, president, John Hunter, secretary, and J. C. Hunter, treasurer. The officers of the Battle Island Company were Thomas Hunter, president, John Hunter, secretary, and R. B. Hunter, treasurer. The officers of the Hunter Bros. Paper Company were Robert B. Hunter, president, John Hunter, secretary, and said Thomas Hunter, treasurer.

So far as appears, the business transactions of the said Paper Company and of the said Arms Company, including meetings of directors, were had and held at the offices of the Arms Company, and its accounts, so far as it kept any, were kept on and in the books of the Arms Company. The Battle Island Company had separate books and offices of its own, and the Paper Company had a minute book of the transactions of its directors. The Arms Company and the Battle Island Company seem to have been doing an extensive business. The money that came into the hands of Thomas Hunter as treasurer of the Hunter Bros. Paper Company came from the sale of its bonds secured by mortgage on this $1,700 parcel of real estate, to the amount of $82,000, and from the sale of stock, to the amount of $2,500. This company employed a superintendent for the mill they anticipated building, and a general manager for such mill, and also architects and draughtsmen. The directors of the Arms Company and of the Paper Company being the same, the affairs and doings of both companies were discussed and determined upon at the same meetings. At one of these meetings the matter of a loan to the Battle Island Paper Company of $75,000 of the money derived from the sale of such bonds and stock of the Paper Company was discussed by the directors of such Paper Company. Thomas Hunter, John Hunter, Robert Hunter, and James C. Hunter, a majority of such directors, were present. At that time it had been agreed not to erect the mill, at present at least, and at this meeting Thomas Hunter, the treasurer of the Paper Company, said, "The Hunter Bros. Paper Company had this money," and he advised the loaning of it, $75,000 of it, to the Battle Island Paper Company. The

proposition was generally discussed. At least one other present expressly approved in words, and the others made no comment or dissent. All the directors were then present, except Samuel Hunter, who was thereafter advised of the transaction and made no objection. No formal resolution to this effect was drawn up, offered, or voted upon. When the money was received by Thomas Hunter as treasurer on the sale of bonds or stock of said Paper Company, it was deposited by such treasurer in the bank account of the Hunter Arms Company and to its credit, and the Hunter Bros. Paper Company was given credit for the amount on the books of the Arms Company, of which said Thomas Hunter was the president. This sale of bonds commenced February 1, 1906, and the last one was sold July 18, 1906. All of the $82,000 went into the bank account of the Arms Company, and that company gave the Paper Company credit for it, and this was done with the knowledge of the officers and directors of both corporations, and as matter of law the relation of debtor and creditor was thus established. There was no conversion or misapplication of the fund so far as the Hunter Arms Company was concerned. As matter of fact, both corporations knew what was being done, and what was done, and no objection was interposed. This, of course, placed this money in the treasury of the Arms Company, and it became indebted to the Paper Company therefor. There is no evidence that the Arms Company was to keep or hold the money in trust, or for safe-keeping, or as a separate or a distinct fund. In point of fact this money, coming from the Paper Company, was by the Arms Company mixed and commingled with its own funds. The Arms Company was receiving other moneys in its business, and depositing same with this in the same account, and was drawing its checks thereon for all of its business purposes. This was done with the knowledge and implied assent of the officers and directors of both corporations and no objection was interposed.

At this time and thereafter there was an open and general running account between the Hunter Arms Company and the Battle Island Paper Company; but the Battle Island Company was to quite an extent, about $100,000, the debtor of the Arms Company mostly for money advanced to it, and at the time of the making of the alleged loan by the Hunter Bros. Paper Company to the Battle Island Paper Company such indebtedness exceeded the sum of $100,000. After the discussion and transaction at the meeting of the directors of said Paper Company and of said Arms Company, and at which the president of the Battle Island Paper Company was present, he being a director and an officer in all three corporations, and at which meeting it is claimed it was agreed and assented to that the Hunter Bros. Paper Company would loan to the Battle Island Paper Company $75,000, and on or about the 31st day of December, 1906, the Hunter Arms Company in its account with Hunter Bros. Paper Company was credited $75,000 as paid to the Battle Island Paper Company for and on account of Hunter Bros. Paper Company, and the Hunter Bros. Paper Company was charged by said Hunter Arms Company with such sum as paid to said Battle Island Paper Company, and later the Battle Island Pa-

per Company credited the said Hunter Bros. Paper Company with said sum of $75,000. No money or property was passed or delivered or actually paid over by the Hunter Arms Company to the Battle Island Paper Company, or by the latter company to the Hunter Arms Company. It was all done by book entries made on the books referred to. This transaction, or these transactions, or the making of such book entries, were known to the officers of all three corporations. The entry of this transaction on the books of the Battle Island Paper Company was not made until June 30, 1909. Mr. Thomas Hunter, the treasurer of the Hunter Bros. Paper Company, the president of the Hunter Arms Company, and also president of the Battle Island Paper Company on being cross-examined by Mr. Mizen, attorney for the claimant here, testified as follows:

"Q. It was assumed from that time forward that the Battle Island Company owed this $75,000 to the Hunter Bros. Paper Company, instead of to the Hunter Arms Company?. In other words, the Hunter Arms Company made entries on its books to that effect? A. Yes, sir. Q. As a matter of fact, Mr. Hunter, the Battle Island Company didn't charge itself on its books with this $75,000 transfer until a long time afterward, did it? A. I don't know about that. Q. Look it up. A. I only know what the Hunter Arms Company did. Q. You were an officer of the Battle Island Company? A. Yes, sir. Q. What officer? A. President. Q. And you were in 1907? A. Yes. Q. 1908? A. Yes. Q. 1909? A. Yes. Q. Referring to the Hunter Bros. Paper Company in the Battle Island Paper Company books, does it not appear there that the Battle Island Paper Company did not assume this $75,000 on its books until the 30th day of June, 1909? A. Yes, sir. Q. Two and a half years afterward? A. Yes; if this is correct. Mr. Shanahan made it out. Q. You have no doubt about it? A. No, sir. Q. And on that day, June 30, 1909, an entry was made in the ledger of the Battle Island Paper Company charging the Battle Island Paper Company with the sum of $75,000, being transfer of account from the Hunter Arms Company? A. Yes; credited the Hunter Bros. Paper Company. Q. And that's the way the transaction appears on the books of the Battle Island Company? A. Yes. Q. And so far as the books of the Battle Island Paper Company are concerned that company did not assume responsibility for this account until that day, June 30, 1909; is that true? A. Yes. Q. And it on that day assumed it as a transfer of account from the Hunter Arms Company, and not from the Hunter Bros. Paper Company; is that true? A. I don't know. Q. Kindly refer to the record. A. Yes, sir. Q. Is that true? A. Yes.

"The Court: Referring to the $75,000?

"Mr. Mizen: Yes.

"Q. And in other words this transfer of $75,000 on the books of the Hunter Arms Company, under date of December 31, 1906, is simply a credit which the Hunter Arms Company gave itself on its books on that day on account of its indebtedness against the Battle Island Paper Company? A. On account of the Battle Island Paper Company's indebtedness against it. Q. Or to it, the Hunter Arms? A. Yes, sir."

It also appears conclusively that the Hunter Arms Company paid interest on the bonds of the Hunter Bros. Paper Company and other expenses and debts of that company by its checks on these bank accounts wherein had been deposited the money derived from sale of stock and bonds, and that, including the $75,000, more was paid out than was received. It also appears that after the Battle Island Company was adjudicated a bankrupt, and after the appointment of a trustee for that corporation, Mr. Thomas Hunter, as treasurer of the Hunter Bros. Paper Company, made out and presented a claim against

that bankrupt corporation for this identical claim. He, of course, knew all the facts. There can be no question that the intention and purpose of those managing, controlling, and conducting the business and financial affairs of these three corporations were to release the Hunter Arms Company from its liability to the Hunter Bros. Paper Company to the extent of $75,000, create an indebtedness of the Battle Island Paper Company to the Hunter Bros. Paper Company in that amount, and reduce the indebtedness of the said Battle Island Paper Company to the Hunter Arms Company in the same amount. Was this done?

We have here the three interlocking directorates of these three independent corporations. It does not appear, and has not been contended, that the one was an agent, or adjunct, or instrumentality of another, or of the others. It is not established that the Paper Company was a mere adjunct or instrumentality of the Arms Company. Intentional fraud on the bondholders of the Hunter Bros. Paper Company is not charged. The Arms Company knew where the money derived from the sale of the bonds of the Paper Company came from, and that it belonged to that corporation. The Battle Island Company knew that the Arms Company owed the money to the Paper Company, and that it (the Battle Island Company) owed the Arms Company, and that the purpose was to make it a debtor of the Paper Company to the amount of $75,000, and at the same time reduce its indebtedness to the Arms Company by that amount. It was all done by a process of bookkeeping or book entries, under the direction of said Thomas Hunter, holding the positions he did in the three corporations. If the Arms Company had paid the Paper Company $75,000 in cash, and the Paper Company had paid it over to the Battle Island Company, as a loan, and the Battle Island Company had then passed it back to the Arms Company as a payment on account, can there be any question that the claim of the Paper Company would be against the Battle Island Company, and not the Hunter Arms Company? If this had been done by a check of the Arms Company, delivered to the Paper Company, and indorsed by it over to the Battle Island Company, and delivered and then indorsed by the latter company back to the Arms Company, and delivered, would or would not the transaction have been legal, no bad faith or intent to defraud being shown? And, if so, is it material that neither cash nor check was actually handled and passed around? If by direction of the Hunter Bros. Paper Company this money which the Arms Company received was actually paid out by it for the purposes of the Paper Company, by giving credits and making changes on its books, is it material that the money or a check did not pass from the one corporation to the other? To constitute a corporate act, and bind the corporation, it is not essential that the board of directors actually pass a written or a formal resolution, or enter it in its minutes. If a proposal is made, and a majority of the directors, a quorum being present, assent to it, and the proposition is then acted on and carried out, the corporation is bound.

Between February 1, 1906, the date of the first sale of the bonds of the Paper Company, and December 30, 1906, the Hunter Arms Company actually paid over to the Battle Island Paper Company the fol-

lowing sums from the mixed and commingled moneys of the Hunter Arms Company and the Hunter Bros. Paper Company, viz.: February 7th, $3,500; March 31st, $3,000; April 5th, $1,000; April 9th, $3,-000; April 10th, $5,000; April 11th, $3,000; April 17th, $5,000; May 19th, $6,000; May 28th, $10,000; May 31st, $5,000; June 2d, $7,000; June 20th, $5,000; June 23d, $7,000; June 28th, $5,500; July 24th, $1,500; July 27th, $5,000. All these were money transactions. Also November 15, $2,267.49, or a total of $77,767.49. It does not appear that these payments or transfers of money were specially made as loans by the said Hunter Bros. Paper Company to the Battle Island Paper Company and as part of the $75,000 loan agreed upon as stated; but it does appear that the Battle Island Company between the dates mentioned actually had that amount of money from the Arms Company and from the mixed and commingled funds referred to.

January 1, 1906, the Battle Island Company was owing Hunter Arms Company $104,965.94, and February 1, 1906, the indebtedness was $116,654.44. December 31, 1906, the $75,000 was credited as paid by the Arms Company to the Battle Island Company by transfer of accounts, on account of the Paper Company, and the Arms Company was then charged as having received $75,000 from the Battle Island Company, and this latter company was credited on its account with the Arms Company $75,000, leaving the Battle Island Company still owing the Arms Company $115,362.94. Excluding the $75,000, the Battle Island Company owed the Arms Company $190,362.95 on December 31, 1906. The Battle Island Company gave no note or other evidence of indebtedness to the Hunter Bros. Paper Company. No date or time was fixed or mentioned on which or within which the Battle Island Company was to pay the alleged indebtedness of $75,000 to the Hunter Bros. Paper Company.

The right and power of the Hunter Bros. Paper Company, a corporation, to loan this money, the proceeds of its bonds sold, is challenged. It is asserted, first, that there was no actual exercise of its power to lend this money, if such power existed; and, second, that no such power existed, and of this fact the Battle Island Paper Company and the Hunter Arms Company were fully cognizant, and that, as the Hunter Arms Company parted with no consideration, and did not change its position, or surrender any right or remedy, the whole transaction relating to this alleged loan was ultra vires of the corporation and void. It must be and is conceded that in this transaction (taking it as a whole) Thomas Hunter, treasurer of the corporation making the alleged loan, was also president of the corporation borrowing the money, if it did borrow, and also president of the corporation which had the money in its possession, and to which corporation the borrower was largely indebted, as stated. It does not appear that the Battle Island Paper Company took any action whatever by its board of directors in the line of borrowing the money. It does not appear that Thomas Hunter had power or authority by custom or otherwise to borrow this money and obligate the Battle Island Paper Company. These transfers were made on the books of the corporations, and it does not appear that any objection was made by any one. The moneys loaned, if loaned, were not surplus earnings,

but the proceeds of the sale of the bonds of the Hunter Bros. Paper Company, including some $2,500 received for stock of the corporation, and constituted substantially all of the assets of the corporation. If a valid transaction, it shifted the remedy of the bondholders of the Paper Company from one against the Arms Company to one against the Battle Island Company, already largely indebted to the Arms Company, and inured to the benefit of the Arms Company, which in the first instance had all of the money belonging to the Paper Company and was liable therefor.

It must be conceded that the Battle Island Company actually had and used a large sum of this money, receiving it from the Arms Company in the manner above stated. The use made of this money derived from the sale of these bonds by the treasurer of the company cannot be approved by any court. It was the moral as well as the legal duty of the directors of the Hunter Bros. Paper Company, as well as of its other officers, to place the money in a safe place and use it for the purpose for which intended, the erection of a plant on the premises mortgaged to secure the bonds, and which premises alone were worth less than $2,000, or invest it in some safe securities awaiting such use, if an investment thereof was allowable. In Murray v. Smith, 166 App. Div. 528, 531, 532, 152 N. Y. Supp. 102, the court went no further than to hold that a corporation (one not expressly authorized to loan money) may loan its "*surplus*" not required for immediate use. The court also drew the distinction between corporate acts allowable by virtue of its charter, or the law under which incorporated, and those expressly forbidden, and also such acts, those malum prohibitum, and those malum in se. Certain acts really ultra vires the corporation may be ratified. so as to bind the corporation while others may not be. In that case the court held that the loan by the corporation of its *surplus* was neither malum prohibitum nor malum in se, and could be ratified so as to become binding.

In the case now before the court the action taken by the directors in the informal manner described, if valid, deprived the Hunter Bros. Paper Company of all its assets, except the real estate, including the money which was to go into a plant to be erected on such real estate, and give such property value as security for the payment of such bonds, and substituted a mere claim against the Battle Island Paper Company, which, so far as appears, was never authorized by any action of the board of directors of the Battle Island Paper Company. The president of the board of directors of that corporation knew of the transaction; but it does not appear it was ever considered, ratified, or approved by the directors, all consenting, or by formal action. As between the creditors of the Hunter Bros. Paper Company, including its bondholders, and the creditors of the Hunter Arms Company, it seems inequitable that such transactions as have been described should operate to release the claims of the former corporation against the last-named corporation for the money deposited with it, and transform them into claims against the Battle Island Paper Company, and I am disinclined to hold that they did. There was no formal action in the matter by the directors of either corporation. The book entries indicate that there was a credit given the Hunter Bros. Paper Company by

the Battle Island Company by assuming an indebtedness of the Arms Company to it for $75,000, and the Arms Company made a corresponding charge against the Battle Island Company, thereby giving it credit for $75,000 on account, and there is nothing to show that the board of directors of either corporation ever consented thereto or were made acquainted with what had been done. Thomas Hunter, the treasurer of the one corporation and president of the others, seems to have known of these entries and to have caused them to be made; but I do not think he had the power to bind the Battle Island Company, and even if all the directors of the Paper Company consented to a loan of its money to the Battle Island Company, it does not satisfactorily appear that they ever assented to a loan in this manner without note, obligation, or security of any kind. At common law the stockholders represent and act for a corporation. When the charter of a corporation, or the law under which it is organized, provides for directors and defines their powers and duties, they represent and may bind the corporation in the exercise of all powers expressly conferred and those incidental thereto, and incidental to and necessary to be performed in carrying on the business (unless the exercise of some power be expressly withheld or forbidden), and as a result the surplus of earnings may be loaned, as stated; but this is far different from loaning substantially all the assets of a corporation to another corporation without formal action of the directors of both, or of either, and without resolution, or note, or other written obligation to pay.

It would seem that when a loan of money is made there ought to be some agreement by competent parties not only to loan, but to borrow, and some mutual agreement or understanding as to the term of such loan, time of payment, etc. It seems to me that these book entries, made as they were, were insufficient to release the Hunter Arms corporation and substitute the Battle Island Paper corporation as the debtor of the Hunter Bros. Paper corporation. As the Hunter Arms corporation had the money, and in paying it over to the Battle Island corporation mixed with its own, at the dates and in the amounts and under the circumstances mentioned, was not then acting pursuant to any directions from the Hunter Bros. Paper corporation, but of its own volition and to serve its own purposes, I cannot find that such transfers of funds to the credit of the Battle Island corporation constituted a loan of the funds of said Paper Company to the Battle Island Company. The Battle Island corporation undoubtedly became indebted to the Arms corporation, but not to the Paper corporation, as there was no understanding that the money belonged to or was coming from the Paper Company. The transaction was too indefinite and uncertain to be held a contract between the three corporations, by which the Paper Company ceased to have a claim against the Arms Company; the Battle Island corporation taking its place as debtor. I must hold that the liability of the Hunter Arms Company to the Hunter Bros. Paper Company was not extinguished in whole or in part, and that the claim was properly allowed.

The order of the referee, allowing the claim against the Hunter Arms Company, is therefore affirmed.